UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

IN THE MATTER OF THE COMPLAINT          2:20-cv-686 c/w 20-cv-881
OF B&J, INC., AS OWNER AND
OPERATOR, OF MOTOR VESSEL ZOIE          JUDGE JAMES D. CAIN, JR.
FOR EXONERATION FROM OR
LIMITATION OF LIABILITY                 MAGISTRATE JUDGE
                                        KATHLEEN KAY

<u>MEMORANDUM IN SUPPORT OF SPOLIATION MOTION
FILED ON BEHALF OF B&J, INC.</u>

<u>Background:</u>

This litigation arises out of the January 2, 2020 capsizing and loss of cargo from deck barge M868 while it was moored in Cameron, Louisiana.  This capsizing of barge M868 resulted in loss of its cargo of concrete pilings, damage to the M868, damage to barge DH9532 moored alongside, the loss of the piling cargo on barge DH9532, and damage to the adjoining dock and a derrick barge, SEATTLE, located adjacent to the dock.  As this court will learn at the trial on the merits, barges M868 and DH9532 were deck barges owned by McDonough Marine/Marmac ("Marmac") which were rented under a bareboat charter to Dunham Price Concrete ("DP").  These barges were to be used by DP to load for transport concrete pilings it had manufactured at its Vinton, Louisiana plant.  These pilings were manufactured by DP under contract with Kiewit Louisiana ("Kiewit") to be delivered for use in connection with Kiewit's billion dollar construction job of the liquified natural gas ("LNG") plant in Cameron, Louisiana.  The LNG construction job was known as the Venture Global Project ("Project").  DP, in turn, had hired the services of a pushboat, ZOIE, which was owned and operated by B&J, Inc. ("B&J").  The ZOIE was used on a number of trips to move the loaded barges from DP plant in Vinton to the dock in Cameron used to offload materials for the Project.  This dock was known as the Liberty Material Offloading Facility ("Liberty MOF").

The voyage at issue for this suit was when the ZOIE pushed the two barges from the DP plant in Vinton from late on December 27, 2019 until the evening of December 28, 2019.  Following which, the two barges were secured at the Liberty MOF.  The ZOIE then departed.  Five days later, the capsizing event occurred.

B&J asserts as part of its defenses in this action that barge M868 was an older barge which was in a wasted and poorly maintained condition.  B&J asserts this condition ultimately the cause for an ingress of water into the barge while it remained moored and secured from December 28, 2019 through January 2, 2020.  Additionally, B&J asserts Kiewit had the exclusive care, custody and control of the barges over that time from delivery on December 28, 2019.  As such, in its role as the bailee, it is asserted the Kiewit failed in its duties to properly monitor and care for the barges which resulted in the capsizing on January 2, 2020.

The merits of these assertions by B&J, Inc. will obviously have to be addressed with evidence at the trial of this cause.  However, this motion and memorandum address certain evidence which clearly was important to the determinations to be made at this trial.  This evidence and the duty to preserve same should have been known by Marmac and/or DP and Kiewit.  It is this missing evidence for which B&J seeks application of the evidentiary principle of spoliation for the failings on the part of the other parties.  Specifically, the court will learn that video camera footage existed which showed the Liberty MOF from the time of delivery of the barges on December 28, 2019 until the time of the capsizing in the early morning of January 2, 2020 and the hours thereafter.  The only video evidence which was preserved by Kiewit was a short "clip" of 20-30 seconds on the morning of January 2, 2020.  But, not the video from the days from December 28, 2019 until this short "clip" from January 2, 2020.  And not any video from the time after the capsizing when barge M868 drifted in the Calcasieu River.

Further, the court will learn that the plate steel which was removed from barge M868 during repairs to the barge after this event was not preserved.  This is despite the fact that eh request for such preservation was made before the repairs were undertaken.  Accordingly, B&J seeks the presumptions which come with spoliation of evidence and that same be applied (1) against Kiewit for the failure to preserve and produce the evidence of the video footage and (2) against Marmac and/or DP for the failure to preserve the plate steel for further examination which was removed from the barge M868 during its repair.

**The Law on Point:**

When a party reasonably anticipates litigation, it must preserve relevant evidence. If a party does not preserve relevant information, it risks severe sanctions.   Federal Rule of Civil Procedure (FRCP) 37(e) sets the standard for sanctions for spoliation of electronically stored information (ESI) in federal court.[1]   Under FRCP 37(e), if a party does not take reasonable steps to preserve ESI and the information is lost and cannot be restored or replaced through additional discovery, a court may:

- Order sanctions no greater than needed to cure the prejudice, if the court finds that the requesting party was prejudiced by the loss of information.

- If it finds that the producing party acted with the intent to deprive the requesting party:

- presume that the lost information was unfavorable to the producing party;

- instruct the jury that it may or must presume that the lost information was unfavorable to the producing party;

- dismiss the action; or

---

[1] Federal Rule of Civil Procedure (FRCP) 37(e); see also 2015 Advisory Committee Notes to FRCP 37 (recognizing that before the 2015 amendments to FRCP 37(e), the federal circuits established significantly different standards for imposing sanctions on parties who fail to preserve ESI); *First Fin. Sec., Inc. v. Freedom Equity Grp.*, LLC, 2016 WL 5870218, at *2 (N.D. Cal. Oct. 7, 2016)).

- enter a default judgment.[2]

It is respectfully submitted this would apply in this case for the failure of Kiewit to preserve the video evidence from the cameras at the Liberty MOF facility.

Since the Federal Rules of Civil Procedure do not address sanctions for spoliation of non-electronic information and other tangible things, the culpability standards for spoliation of non-ESI vary by court. In the Fifth Circuit, a party must preserve unique, relevant evidence that might be useful to an adversary. This duty to preserve extends to the party's or potential party's employees who are likely to have relevant information.[3]   A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.[4]   When determining whether sanctions are warranted and, if so, what they should include, courts consider:

- Prejudice to the requesting party.

- The spoliating party's culpability, which can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation.[5]

An adverse inference is appropriate only on a showing of bad faith or bad conduct.[6]   Severe sanctions, including default judgment or striking pleadings, require bad faith.[7]

The general duty to preserve potential evidence in federal litigation is a creature of the federal common law, even though some federal statutes impose preservation obligations on certain

---

[2] Federal Rule of Civil Procedure (FRCP) 37(e)

[3] *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011).

[4] *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015).

[5] *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010).

[6] *Guzman*, 804 F.3d at 713; see also *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 208 (5th Cir. 2007) ("typically we do not draw an inference of bad faith when documents are destroyed under a routine policy")).

[7] *Rimkus Consulting*, 688 F. Supp. 2d at 614; see also *Port of S. La. v. Tri-Parish Indus., Inc.*, 27 F. Supp. 2d 332, 346 (E.D. La. 2013).

individuals and entities. [8]   An individual or entity generally has a duty to preserve evidence when the individual or entity reasonably anticipates litigation. [9]

The US Court of Appeals for the Fifth Circuit requires an individual or entity to preserve potentially relevant evidence when it has "notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant". [10]   It is respectfully submitted that this applies where Marmac and/or DP and its representatives did not preserve the plate steel from barge M868.

**Triggering Events:**

Duty to preserve standards, whether considered generally or specific to a particular jurisdiction, do not provide a bright line rule regarding when an individual or entity's duty to preserve information arises. Instead, courts must consider the specific facts and circumstances to determine when a party should reasonably anticipate litigation. For example, courts have held that an individual or entity's duty to preserve arose when:

- It decided to initiate litigation[11]

- It received a letter threatening litigation[12]

- It was involved in prior litigation regarding the same subject matter[13]

- It learned of related disputes between similarly situated parties in the same industry[14]

---

[8] See, *Brown v. Tellermate Holdings Ltd.*, 2014 WL 2987051, at *19 (S.D. Ohio July 1, 2014).
[9] See, for example, *Hawkins v. Coll. of Charleston*, 2013 WL 12145958, at *2 (D.S.C. Sept. 17, 2013) citing *Silvestri v. Gen. Motors Corp*., 271 F.3d 583, 591 (4th Cir. 2001).
[10] *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (citing *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010).
[11] See *Apple Inc. v. Samsung Elecs. Co., Ltd*., 888 F. Supp. 2d 976, 997 (N.D. Cal. 2012).

[12] See *Gonzalez-Bermudez v. Abbott Labs. PR Inc.*, 214 F. Supp. 3d 130, 162 (D.P.R. 2016).

[13] See *Williams v. BASF Catalysts LLC*, 2016 WL 1367375, at *7 (D.N.J. Apr. 5, 2016); *Stinson v. City of New York*, 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016)).
[14] See *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1190-91 (D. Utah 2009).

- A governmental agency initiated an enforcement action[15]

- A potential plaintiff filed an accident report[16]

**Who Has a Duty to Preserve**

While most courts discuss a party or third party's duty to preserve, some notable decisions emphasize that counsel also have a duty to preserve potentially relevant information. Specifically, courts have noted that the duty to preserve "runs first to counsel" and further require counsel to advise the client regarding the client's obligation to preserve potentially relevant information.[17] In a landmark decision, the U.S. District Court for the Southern District of New York elaborated on counsel's duty, holding that counsel must:

- Implement and oversee compliance with the litigation hold.

- Monitor the client's document production efforts.[18]

Accordingly, counsel must take an active role in guiding clients during the entire preservation process. It is respectfully submitted that counsel for DP and counsel for Marmac had a presence soon after the capsizing on January 2, 2020. It is unknown if counsel for Kiewit had a similar presence in the time frame immediately after January 2, 2020. It is respectfully submitted that Marmac, DP and Kiewit, as well their legal counsel, had the duty to preserve the relevant information and evidence of the videos and plate steel.

---

[15] See *M & T Mortg. Corp. v. Miller*, 2007 WL 2403565, at *5-6 (E.D.N.Y. Aug. 17, 2007).
[16] See *McCabe v. Wal-Mart Stores, Inc.*, 2016 WL 706191, at *2 (D. Nev. Feb. 22, 2016).
[17] See *Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, 2018 WL 264111, at *10 (S.D.N.Y. Jan. 2, 2018) (collecting cases); see also *Mooradian v. FCA US, LLC*, 286 F. Supp. 3d 865, 870 (N.D. Ohio 2017).
[18] *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (further holding that both counsel and client must "make certain that all sources of potentially relevant information are identified and place 'on hold'"); see also *Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, 2011 WL 1456029, at *12 (S.D. Fl. Apr. 5, 2011) (internal citations omitted).

**To Whom a Party Owes the Duty to Preserve**

When ascertaining when a party first had a duty to preserve in the context of a motion for spoliation sanctions, some courts look specifically at when the alleged spoliator first anticipated litigation with the party seeking sanctions, rather than when the alleged spoliator first anticipated litigation generally. In other words, some courts recognize that, even for a single issue or incident, a party may have multiple duties to preserve that arise at different times and run to various potential adversaries.   Courts have addressed this issue when a party seeking spoliation sanctions (the movant) advocates for a "shifting" duty to preserve by arguing:

- That the alleged spoliator had a duty to preserve that arose when it reasonably anticipated that another entity (Adversary A) would initiate litigation against the alleged spoliator.

- The duty that the alleged spoliator owed to Adversary A covered the same information that later became relevant in the present litigation between the movant and the alleged spoliator.

- That the alleged spoliator lost or destroyed information that is relevant to the present litigation between the movant and the alleged spoliator:

- while under a duty to preserve owed to Adversary A; but

- before the alleged spoliator reasonably anticipated the present litigation with the movant.

- That the court should sanction the alleged spoliator in the present litigation.

Some courts reject this "shifting duty" concept. These courts reason that the movant does not have standing to assert a spoliation claim because, at the time the alleged spoliator lost or destroyed the evidence, the alleged spoliator owed a duty to Adversary A but not to the movant.[19]

---

[19] See, for example, *Rockman Co. (USA), Inc. v. Nong Shim Co., Ltd*, 229 F. Supp. 3d 1109, 1123 (N.D. Cal. 2017) (holding that the initiation of a government investigation does not create for the target of the investigation a duty to preserve owed to other, non-governmental individuals or entities); *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 2015 WL 4635729, at *11 (N.D. Ga. Aug. 3, 2015) (holding that the receipt of a government **subpoena** did not trigger a duty to preserve owed to or enforceable by the plaintiffs in later civil litigation); *Brigham Young Univ. v. Pfizer,*

However, courts may take a more liberal view and sanction parties for spoliation if they generally anticipate litigation regardless of whether they specifically anticipated litigation with the movant.[20] In this matter, clearly both Marmac and DP had legal counsel involved in the days after this event and employed marine surveyors who were their representatives.  Through counsel and these representatives, these parties knew that the plate steel had been requested to be retained.  And, in the case of Kiewit, the on-site pilings supervisor, Ace Duyao, specifically addressed the videos from the time the barges arrived on December 28, 2019 through the time of the capsizing as being reviewed in their investigation.  Clearly, he knew as of January 2 or 3, 2020 that these were of significance.  Yet, to date, these videos have not been produced and it is understood they were not preserved.

**Information Subject to the Duty Preserve**

An individual or entity with a duty to preserve need not preserve all information. Rather, the duty to preserve generally extends only to information (including ESI, hard copy documents, and other tangible items) that:

- Are in the individual or entity's possession, custody, or control[21]

- That the individual or entity knows (or should know) are either:

- relevant in the anticipated litigation;

- reasonably calculated to lead to the discovery of admissible evidence;

---

*Inc.*, 282 F.R.D. 566, 572 (D. Utah 2012).
[20] See, for example, *Williams*, 2016 WL 1367375, at *7 (noting that the duty to preserve generally runs to a specific party, but holding that the case was an instance in which prior litigation with other similarly situated entities "sensitized" the defendant to the possibility of future, similar lawsuits); *M & T Mortg. Corp.*, 2007 WL 2403565, at *5-6).

[21] See *Woods v. Scissons*, 2019 WL 3816727, at *4 (D. Ariz. Aug. 14, 2019) (holding that the City of Prescott had a duty to preserve ESI that the city police department controlled in a case in which an individual police officer was the sole defendant, and imputing the City's **spoliation** to the individual defendant).

8

- reasonably likely to be requested during discovery; and

- the subject of pending discovery.[22]

Again, respectfully Kiewit knew of the significance of the videos on the date of the capsizing of January 2, 2020 per the e-mail exchanges that will be addressed at trial. And, both DP and Marmac had marine surveyors aware of the request for retention of the plate steel before repairs were made in January 2020. These entities had the exclusive control of the evidence and both knew that it was relevant to this cause.

**Application to This Case:**

The evidence at trial will establish that this video surveillance evidence in the control of Kiewit and was not preserved. This video evidence was from the time of December 28, 2019 when the barges were delivered and secured by the ZOIE at the Liberty MOF to the time of the capsizing event on January 2, 2020 and thereafter. The evidence at trial will establish that a video surveillance camera was on site and that Kiewit had the ability to not only obtain the video recordings but to preserve those from December 28, 2019 through the day on January 2, 2020. The evidence will show Kiewit did preserve a 20 to 30 second clip of the video on January 2, 2020 which showed the event of the capsizing of barge M868. The first e-mail with notice of the capsizing came from Ace Duyao, Piling Superintendent for Kiewit. In that e-mail sent at 2:42 p.m. to Stacy Berlin and Jody Singletary at DP, he advises not only about the event, "but from what we saw on the video and barge, there might have already been a leak on the barge and that it slowly took on water from when it arrived through the holiday when we had no one on site…"[23]

---

[22] See *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (internal citations omitted); see also *EPAC Tech., Inc. v. HarperCollins Christian Publ'g, Inc.*, 2018 WL 1542040, at *17 (M.D. Tenn. Mar. 29, 2018); *Harbor v. Cherniss*, 2017 WL 2472242, at *2 (E.D. Cal. June 8, 2017); *Czuchaj v. Conair Corp.*, 2016 WL 4161818, at *1 (S.D. Cal. Apr. 1, 2016).

[23] Exhibit A, January 2, 2020 e-mail of Ace Duyao at 2:42 p.m. in fifth sentence, first paragraph, bate stamp page KLA000084.

He notes later in that same e-mail that they "….are working…to get better videos and photos of what happen…"[24]  Within five minutes, he sends a second e-mail with the Google Drive link to download the video and notes "Video Quality is not the best, but we are working on getting an export of this video and some still shots from when it arrived and through the holiday."[25] Thereafter, on January 8, 2020, the Kiewit Project Director, Joe Miller, sent a letter to Jody Singletary at DP that stated: "Video recording of the incident shows DP supplied barge M8689 took on water over the next few days causing it to list to the port side."[26]  However, although Kiewit sent these e-mails within hours and this letter within days of the January 2, 2020 capsizing, no production by Kiewit of the videos from the arrival on December 28, 2019 through January 2, 2020 has ever been made.

B&J submits these videos would have shown conclusively that the barges were properly delivered level and properly secured on December 28, 2019. While this evidence was needed by B&J to help prove that it complied with its obligations as to delivery and securing of the barges, it was also needed by B&J to address the defense that Kiewit failed in its duties as a bailee of the barges.  It is the position of B&J that Kiewit, having complete care, custody and control of the barges over the days from December 28, 2019 through January 2, 2020, was required to be proactive in its role as bailee.  This would include the duty to monitor the moorings to determine if there were strains on the lines indicating the barges were taking on water.  To monitor the barges to see if they began to take on a "list" or a change in "trim" (if the bow or the stern of the vessel is more deeply submerged into the water) again indicating an ingress of water.  Or, to monitor to see

[24] Exhibit A, January 2, 2020 e-mail of Ace Duyao at 2:42 p.m. in first sentence, second paragraph, bate stamp page KLA000084.
[25] Exhibit B, January 2, 2020 e-mail of Ace Duyao ar 2:47 p.m. in second paragraph, bate stamp page KLA000509..
[26] Exhibit C, January 8, 2020 letter of Joe Miller, in sixth sentence, first paragraph, bate stamp page DPCON0000579.

10

if there was a change in the freeboard (the height of the vessel's side between the waterline and the top deck) to indicate an ingress of water.  It is further asserted such video would evidence whether or not Kiewit had assigned anyone one to go to the dock area or onto the barges to perform such monitoring duties over those five days.  If, as Kiewit now claims, the barge(s) took on water over those five days, such monitoring of the barges by Kiewit would have been shown (or not) on such video evidence.  And, if the barges took on water as alleged by Kiewit, such active monitoring of the barges would have alerted Kiewit over a period of the five days from December 28, 2019 to January 2, 2020 to take some action as a prudent bailee.  These actions could have included opening a hatch to see if water had entered into the hull of the M868 and to proactively place hoses and pumps into the hull to dewater the barge.  Or, Kiewit could have monitored the mooring lines to see if there was a strain on the lines or a list which would have allowed them to begin to offload the barges.  This offloading would have not only avoided the loss of the cargos of the concrete pilings, but it would have prevented the capsizing to occur which caused the additional damages to the barges, dock and SEATTLE.   Further, it is submitted this evidence of the video recordings would allow the parties to see when in time the barge M868 broke free from its moorings and where it drifted.  The court will learn at trial that the M868 drifted an unknown number of hours and may or may not have struck objects in and around the Project before it was found and secured across the Calcasieu waterway.

In addition, the court will learn at trial that one of a number of marine surveys was done on January 22, 2020.  On that date, a joint survey of barge M868 was attended by surveyors appearing for DP (M.P. Singh), McDonough Marine (James Stansbury), and B&J (Howard Held) in addition to attorney Barrett Rice for DP and David Sharpe for McDonough Marine.  At the end of the survey report, it was specifically requested "…kindly retain the cropped steel, in way of

damaged areas identified on items No. 3.  This is in way of stern rake bottom plating which was found set up and sharply creased.  We would like to further examine these pieces."[27]

In discovery, B&J sent out its Request for Inspection on January 21, 2022 to measure, survey and photograph the removed plate steel from the deck barges.[28]  On February7, 2022,  a follow up e-mail was sent by counsel for B&J about the status of inspecting the plate steel removed from the barges.[29]  In response, the initial reply of counsel representing both Marmac and DP (Tarak Anada) was that "I have been unable to find any evidence that the material was preserved. I am unaware of any requests to preserve the material other than my own client's expert's request. But at any event, all parties had experts present at the dry dock inspection, and the material was photographed in detail."[30]  The response then on behalf of B&J's counsel was that "All surveyors asked for the metal to be preserved.  The request was written on the report by yours but they all agreed it would be done."[31]

On February 24, 2022, DP Concrete and McDonough Marine, through counsel, served its Objections and Response to the Request for Inspection.[32]  In pertinent part, they responded "Subject to those objections. Marmac, LLC will make the subject materials available for inspection near the vicinity of Amelia, LA on any date that B&J, Inc. selects that is also mutually convenient for all other parties.  Respondents request that they be given at least 5 business days' notice of the date of the inspection."[33]

---

[27] Exhibit D, January 22, 2020 joint survey report at bate stamp page DPCON 00000634.
[28] Exhibit E, January 21, 2022 transmittal e-mail of Bill Schwartz, counsel for B&J, with Request to Inspect under Rule 34(a)(2).
[29] Exhibit F, February 7, 2022 e-mail string of Bill Schwartz and Tarak Anada.
[30] Exhibit F.
[31] Exhibit F.
[32] Exhibit G, DP Concrete and McDonough Marine's Objection and Response to B&J's Request for Inspection.
[33] Exhibit G.

The e-mail string of February 18-24, 2022 in which that Response was forwarded is now also attached as an exhibit to this filing.[34]  On receipt of the discovery response, undersigned counsel for B&J inquired: "I understood from your prior e-mails that the metal was not retained. Am I now to understand that it has been retained?  And, who can testify under oath that this is the metal from the barge(s)?"[35]  And, in response, Mr. Anada replied in pertinent part "The materials have been preserved."[36]

The ultimate arrangements to travel to Amelia, Louisiana by B&J and its experts to inspect the materials was made for March 15, 2022.  However, on arrival, the inspection was of barge M868 but not of any plate steel removed from the barge during its repairs.  No answer was provided to B&J counsel nor its experts as to the whereabouts or existence of the plate steel.  Thereafter, on April 5, 2022, DP Concrete and McDonough Marine sent an Amended Objections and Responses to B&J's Request for Inspection.[37]  And, in contrast to the response dated February 24, 2022 (Exhibit G attached hereto), the response was "Subject to those objections, beyond what was made available to B&J, Inc. for inspection on March 15, 2022, Respondents are not in possession of any further materials responsive to B&J, Inc.'s Request for Inspection dated January 21, 2022."[38]

In summary, the response has been (1) there was no request to preserve the metal, (2) to the materials have been preserved, (3) to the inspection can and was made on March 15, 2022 without notice that the materials would not be presented for inspection and (4) now to "what was made available …for inspection on March 15, 2022…(is all there is and)…Respondents are not in

---

[34] Exhibit H, February 18 to 24, 2022 e-mail string of Bill Schwartz and Tarak Anada.
[35] Exhibit H at page 1, e-mail response of Bill Schwartz to Tarak Anada on February 24, 2022 at 9:11 a.m. paragraphs 2 and 3.
[36] Exhibit H at page 1, e-mail response of Tarak Anada to Bill Schwartz on February 24, 2022 at 9:17 a.m.
[37] Exhibit I, Amended Objections and Responses to Request for Inspection dated April 5, 2022.
[38] Exhibit I.

possession of any further materials responsive to B&J's Request for Inspection…"  In other words, there is no preservation of the plate steel from the barges and most importantly, barge M868.

As the court will learn at trial, the condition of barge M868 both before and after this event on January 2, 2020 is a significant issue.  B&J takes the position the barge had many corroded and wasted areas in its plate steel.  In particular, there were areas where the holing of the bottom plate was surrounded by barnacles.  B&J contends that this is a clear indication of the fact these holes in the hull were due to deterioration over time and a lack of maintenance and not from any recent event involving the hull of the M868.  As the testimony at trial will show, the preservation and examination of such plate steel would be dispositive of the issue whether the holing was due to recent impact or outside physical force or, instead, due to wastage and lack of maintenance.  The failure to preserve the plate steel to allow such evidence to be examined by the experts should result in a finding of spoliation of evidence on the part of Marmac and/or DP and its representatives.  And, a finding that such evidence would have been favorable to the defenses raised by B&J.

While it is certainly unlikely this court can make a dispositive finding prior to trial where it will hear and view all the evidence, or the need for the missing evidence, this memorandum is filed to address the issue and allow the court to be prepared to address same in the course of the trial.

**Respectfully Submitted:**

**LISKOW & LEWIS, APLC**

**/s/*William B. Schwartz***
William B. Schwartz, T.A. (La. #11854)
Jill S. Willhoft (La. #28990)
701 Poydras Street, Suite 5000
New Orleans, LA  70139

Telephone: 504-581-7979
Facsimile: 504-556-4108
Email: wschwartz@bhbmlaw.com
         jwillhoft@bhbmlaw.com

Counsel for Plaintiff's in Limitation, B&J Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May, 2022, I electronically filed the foregoing memorandum with the Clerk of Court using the CM/EFC System which will send a notation of electronic fling to all counsel of record.

_____*William B. Schwartz*_____