UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF B&J, INC., AS OWNER AND OPERATOR, OF MOTOR VESSEL ZOIE FOR EXONERATION FROM OR LIMITATION OF LIABILITY | 2:20-cv-00686 c/w 2:20-cv-00881<br><br>JUDGE JAMES D. CAIN, JR.<br><br>MAGISTRATE JUDGE KATHLEEN KAY |

### CLAIMANTS' TRIAL MEMORANDUM ON SELECT LEGAL ISSUES

Claimants DP Concrete Products, LLC and Marmac, LLC d/b/a McDonough Marine Service ("Claimants") submit the following memorandum of law pursuant to the Court's request of April 5, 2023.

**A.  Pursuant to the maritime law-recognized doctrine of *res ipsa loquitur*, if holes or tears in a barge did not exist before it was towed, "it is obvious that they could not have been inflicted absent the negligence of the tug."**

The doctrine of *res ipsa loquitur* recognized in maritime law presumes that a party is negligent when it had exclusive control of whatever caused the injury, even if there is no evidence of a specific act of negligence. The Latin phrase literally translates to "the thing speaks for itself."

In this case, both a September 2019 on-charter survey of the M 868 conducted by Stansbury and Associates, and an August, 2019 survey of the M 868 conducted by Howard Held (B&J's retained expert surveyor) show that there were no holes, tears or upsets in Barge M 868 that could have compromised its water-tight integrity. Indeed, these surveys were done while the barge was sitting in water, and its voids were found to be completely dry by both surveyors.

After these surveys, B&J towed the M 868 three times from Vinton to Cameron and back with no listing or evidence of water intrusion. During these previous voyages, the M 868 was able

to be left floating at Kiewet's dock while waiting to be offloaded for as many as 19 days.[1] It is therefore apparent that the M 868 was undamaged and watertight before the voyage at issue.

During the December 27-28, 2019 voyage, "something happened" to change this. While B&J has denied grounding the barge or scraping it across rip rap, it is "obvious that the[ damage to the bottom of M 868] could not have been inflicted absent the negligence of the tug." This maritime legal principle of *res ipsa loquitur*, established by the Fifth Circuit and followed by district courts, is concisely explained in *First Mississippi Corp. v. Fielder Towing, Co.*, 469 F. Supp. 1080 (N.D.MS. Feb 7, 1979).

In *First Mississippi Corp.*, the district court held a bench trial with facts strikingly similar to those presented herein. There, a barge was surveyed and subsequently inspected and "found to be in a safe, watertight and seaworthy condition." *Id*. at 1082. The barge was then placed in the tow of a tug operated by Fielder Towing Co. *Id.* Upon the barge's delivery to its final destination, however, "the hatch covers were opened and it was discovered that the cargo was wet and in a substantially damaged condition." *Id*. at 1083. After the water entry was discovered, the barge was surveyed again, and it was found that "the forward rake of the barge had been holed. As a result of said damage to the barge, water had entered the cargo compartment and damaged plaintiff's cargo." *Id.*

The court found that "[t]he nature and characteristics of the tears and holes in the bottom of the bow rake and wing tanks are such as would probably have occurred had the barge come into contact with some hard object or objects in the movement upriver." *Id.* at 1084. The captain of the tug, however, testified that he felt no indication of striking a fixed object during the voyage. *Id.* at 1083. The court therefore determined that "[t]he evidence does not affirmatively reflect any reason

---

[1] *See* Kiewet's demonstrative Ex. 315a.

for the holing of the barge while in the tow of the tug,"[2] and that "[t]he parties did not introduce any evidence from which the court could make a finding as to the cause of the holes or tears in the barge."

However, because there was no evidence that this damage preexisted the barge being placed in the tow of the tug, "[i]t necessarily follow[ed] that the holes or tears appearing in the barge upon delivery were sustained on the voyage while in the care of the tug." *Id.* at 1084-85. The court ultimately held the towing company liable for the damage to the barge and subsequent water intrusion. The court, relying on the *res ipsa loquitur* principles established by the Fifth Circuit, explained its ruling as follows:

> The court recognizes and adopts the rule that the mere fact that a barge is in good order when received and in a damaged condition when delivered does not raise any presumption of fault. *Stevens v. The White City*, 285 U.S. 195, 202, 52 S. Ct. 347, 76 L. Ed. 699 (1932).
>
> The court also recognizes the rule, **approved by the Fifth Circuit in a number of cases**, that while the burden is on the tow to show negligence on the part of the tug, ***special circumstances may create a strong presumption of negligence, in which event the burden is on the tug to rebut the prima facie case, or, at least to show a reasonable excuse for the accident other than its own negligence***. *Bisso v. Waterways Transportation Company*, 235 F.2d 741, 744 (5th Cir. 1956). *Simkins v. R. L. Morrison & Sons*, [107 F. 2d 121 (5th Cir. 1939)].
>
> Accepting as correct the finding that the holes or tears in the barge did not exist when the bar was taken into the tow of the tug, ***it is obvious that they could not have been inflicted on the barge absent negligence of the tug. It was the duty of the tug to come forward with some reasonable explanation as to the manner in which the holes or tears were sustained by the barge***. This was not done by the tug. The only member of the crew who testified was the captain, and the tug's log was not produced. The court concludes that ***the tug***

---

[2] *Id.* at 1084.

> ***failed in its duty to offer a reasonable explanation which would exonerate it from negligence.***

*Id.* at 1085 (emphasis added).

Moreover, in response to the towing company's argument that an unexplained hole in the interior of the barge caused the barge owner to be at fault (just like B&J attempts to do in this case), the court held that "the existence of the unexplained hole in the cargo compartment does not act to relieve the tug of liability."

The case at hand is strikingly similar to *First Mississippi Corp.* Just like in that case, there is no evidence that the holes and upsets allowing water intrusion into the M 868 were present prior to B&J's December 27-28, 2019 voyage. Therefore, "***it is obvious that they could not have been inflicted on the barge absent negligence of the tug.***" As such, it is the duty of B&J to come forward with "***a reasonable excuse for the accident other than its own negligence***."

Citing the same Fifth Circuit jurisprudence relied on in *First Mississippi Corp.*, the Eastern District of Louisiana has more recently applied the doctrine of *res ipsa loquitur* to another tug and tow matter. In *McDonough Marine Serv. v. Rainbow Marine Contrs.*, the Eastern District recognized these same principles.

### II. The Doctrine of Res Ipsa Loquitur

> Courts have generally recognized that the delivery of a tow to a tug in good condition and delivery of the tow at its destination in a damaged condition raises no presumption of fault against the tug. Despite this general rule, this Circuit has recognized that certain circumstances create a strong presumption of negligence, casting the burden upon the tug to at least show a reasonable excuse for the accident other than its own negligence. *Simkins v. Morrison*, 107 F.2d 121, 122 (5th Cir. 1939).

*McDonough Marine Serv. v. Rainbow Marine Contrs.*,1998 WL 398055 (E.D. La. July 15, 1998).

In this case, the evidence establishes that the upsets, holes and longitudinal scrape marks on the bottom of the M 868 were not present prior to the December 27-28, 2019 voyage. It is therefore "obvious" that something happened during that voyage. This circumstance creates a "strong presumption of negligence" on B&J's part, which B&J can present no evidence to rebut. *See also The Harper No. 145,* 42 F.2d 161 (2d Cir. 1930) ("When a barge owner supplies a seaworthy barge that subsequently sustains an unexplained leak, negligence on the part of the tower or fleeter will be presumed.").

Additionally, because the damage to the M 868's stern rake is consistent with the barge striking a fixed object, the *Oregon Rule* is invoked. Under the *Oregon Rule*, "[w]hen a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault." *Am. Commer. Barge v. Alter Barge Line, Inc.,* No. 01-933, 2002 U.S. Dist. LEXIS 19189, at *4 (E.D. La. Oct. 3, 2002) (citing *The Oregon,* 158 U.S. 186, 197, 39 L. Ed. 943, 15 S. Ct. 804 (1895)).

**B.   The Burden of Proof in Limitation of Liability Proceedings.**

The burden of proof in a Limitation action is a two-step inquiry that is divided between the vessel owner and claimants. The claimants bear the initial burden and are required to show that the loss was caused either by negligence of the tower or conditions of vessel unseaworthiness.[3] If the claimants are able to meet their burden, ***the burden then shifts to the vessel owner to prove a lack of privity or knowledge of the negligence or unseaworthy condition that caused the accident***.[4] When a corporation owns the vessel, the test is whether the culpable participation or

---

[3] *Complaint of Port Arthur Towing co. on Behalf of M/V Miss Carolyn*, 42 F.3d 312 (5th Cir. 1995).

[4] *Coryell v. Phipps*, 317 US 406, 409 (1943)

neglect of duty can be attributed to an officer, managing agent, supervisor, or other high level employee of the corporation.[5]

The privity or knowledge question is critical because the shipowner can only limit its liability if the accident was occasioned or incurred *without* his privity or knowledge. "Privity or knowledge" implies some sort of complicity in the fault that caused the accident. *Brister v. A.W.I., Inc.,* 946 F.2d 350, 355 (5th Cir. 1991) (citations omitted).

Privity or knowledge can be actual or constructive. *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 4 (1st Cir. 1999) (citing *Spencer Kellogg & Sons, Inc. v. Hicks,* 285 U.S. 502, 512, 52 S.Ct. 450, 76 L. Ed. 903 (1932)). "[A] corporate shipowner may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence." *Brister,* 946 F.2d at 356. "A corporate owner, therefore, must overcome a presumption not only that its officers and managers had actual knowledge, but also that they should have known of the unseaworthy or negligent condition that caused the injury." *Id.* (citing *In re Patton-Tully Transp. Co.,* 797 F.2d 206, 211 (5th Cir. 1986)).

"When the shipowner is a corporation, knowledge 'is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss.'" *In re Savage Inland Marine*, 539 F. Supp. 3d 629, 654 (E.D. Tex. 2021) (quoting *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1473-74 (5th Cir. 1991)); *see also In re Omega Protein, Inc.*, 548 F.3d 361, 371 (5th Cir. 2008). "Privity or knowledge is therefore deemed to exist if the shipowner has the means of obtaining knowledge, or if it would have obtained the knowledge by reasonable inspection." *In re*

---

[5] *Carr v. PMS Fishing Corp.*, 191 F 3d 1, 4, 1999 AMC 2958 (1st Cir. 1999).

*Savage Inland Marine*, 539 F. Supp. 3d at 654 (quoting *China Union Lines Ltd. v. A.O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966)).

"Generally, **a finding of negligence indicates complicity in the cause of the accident sufficient to make limitation unavailable**…." *Id.* (citations omitted) (emphasis added). Moreover, the shipowner has a nondelegable duty to man the ship with a qualified master and crew. *Empire Seafoods, Inc. v. Anderson,* 398 F.2d 204, 210 (5th Cir. 1968).

In this case, DP Concrete submits that B&J negligently damaged Barge M 868 for reasons detailed in Part A, and because its crew negligently failed to inspect its voids and record its drafts. "Prudent seamanship further requires that the crew of a tug conduct continued inspections of the . . . void tanks on a barge to insure that they are secure and dry …." *Albany Ins. Co. v. Bengal Marine, Inc.,* Civil Action No. 85-5903, 1987 U.S. Dist. LEXIS 6455, at *10-11 (E.D. La. Apr. 24, 1987) (citing *Aiple Towing Company, Inc.,* 534 F. Supp. 409 (5th Cir. 1982)).

DP Concrete further submits that B&J's violations of the regulations detailed in Part C contributed to the damages. Because DP Concrete has met its burden of establishing negligence, the burden now shifts to B&J to establish that its management *did not* have privity or knowledge of the negligence or unseaworthy condition that caused the incident.

B&J's management did not provide sufficient policies, procedures or training to the ZOIE's crew to safety inspect the barges in its tow for water intrusion. This failure to properly record the drafts[6] and check the voids of the M 868 directly led to the damages incurred in this case. Accordingly, B&J cannot meet its burden to prove a lack of privity or knowledge of the negligence that caused the incident. *See Trico Marine Assets Inc. v. Diamond B Marine Servs.,* 332 F.3d 779, 289 (5th Cir. 2003) (denying limitation of liability due to management's failure to (1) inspect the

---

[6] Detailed in Part C.

vessel's logs, which would have indicated the Captain's negligence and (2) properly train the captain. *"[E]ven though there were navigational errors made, all errors that led to the collision were simply due to their 'hands-off' approach to management*.").

### C.     B&J violated numerous USCG regulations.

Subchapter M is a set of regulations that apply to marine towing companies such as B&J. The following provisions are applicable to this case:

**SUBPART H—Towing Safety**

**46 CFR § 140.800 Applicability**

This subpart applies to all towing vessels unless otherwise specified. Certain vessels are also subject to the navigation safety regulations in 33 CFR parts 163 and 164.

**SUBPART B—General Operational Safety**

**46 CFR § 140.205 General Vessel Operation**

(b) Towing vessels with a Towing Safety Management System (TSMS) must be operated in accordance with the TSMS applicable to the vessel.

B&J's TSMS provides that "[t]he captain and mate shall be familiar with **33 CFR part 164.80—Navigation Safety Regulations** and applicable subparts of 46 CFR part 97- Operations."

**33 CFR § 164.80** provides that a tug boat's "voyage plan *must* follow company policy and *consider the following*":

*iv. Forward and after drafts of the barge or barges* and under-keel and vertical clearances (air-gaps) for all bridges, ports and berthing areas.

In this case, it is uncontested that B&J did not record or consider the forward (front) and aft (rear) drafts of either the M 868 or DH 9532. Because the damage the M 868 sustained during the voyage was to the bottom of its stern rake, upon arriving at Kiewet's facility, water entry on to the stern rake compartment had likely commenced. This would have caused M 868 to have a slight forward leaning list. While this list may not have been recognizable by merely looking at the barges to see if they were level, it likely would have been apparent from comparing the forward and aft

drafts. B&J's failure to consider the forward and aft drafts of the M 868 led to the water intrusion remaining undetected.

Additional regulatory violations committed by B&J include:

**33 CFR § 164.72 Navigational-safety equipment, charts or maps, and publications required on towing vessels**

Per Subpart (a)(5), the ZOIE was required to carry an "echo depth-sounding device."

**46 CFR § 140.630 Lookout**

(a) Throughout the trip or voyage the master and officer in charge of the navigational watch must assess the requirement of a lookout, consistent with 33 CFR 83.05. A lookout in addition to the master or mate (pilot) should be added when necessary to:

(1) Maintain a state of vigilance with regard to any significant change in the operational environment;

(2) Assess the situation and the risk of collision/allision;

(4) Detect any other potential hazards to safe navigation.

(b) In determining the requirement for a lookout, the officer in charge of the navigational watch must take full account of relevant factors including, but not limited to: state of weather, visibility, … proximity of dangers to navigation…."

The *Pennsylvania rule* is "a presumption in admiralty law that a statutory violation by a party to a collision is a cause of the damage unless it is established that the violation could not have caused or contributed to the collision." *American River Trans. Co. v. Kavo Kaliakra SS.* 148 F.3d 446, 449 (5th Cir. 1998) (citing *The Steamship Pennsylvania v. Troop.* 86 U.S. 125, 22 L. Ed. 148 (1873)). Because B&J violated the above regulations, the burden shifts to B&J to prove that its regulatory violations could not have contributed to the damages sustained in this matter.

Respectfully submitted,

*/s/ Tarak Anada*
JEFFERSON R. TILLERY (17831)
TARAK ANADA (31598)
Jones, Walker LLP
201 St. Charles Avenue
New Orleans, Louisiana 70170-5100
(504) 582-8322 Telephone
(504) 589-8322 Facsimile
jtillery@joneswalker.com
tanada@joneswalker.com

***Attorneys for DP Concrete Products, LLC and Marmac, LLC d/b/a McDonough Marine Service***