# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

IN RE: B & J INC            **CASE NO.  2:20-CV-00686 LEAD**
                                                  **MEMBER 2:20-881**

**VERSUS**                                **JUDGE JAMES D. CAIN, JR.**

                                             **MAGISTRATE JUDGE KAY**

## TRIAL OPINION

The Court presided over a bench trial on this matter from April 3, 2023, until April 6, 2023.  Post-trial briefs were order and have now been submitted. As noted in the above caption, the Lead case is *In re: B& J, Inc*. (Civil Action 2:20-686) and DP Concrete LLC v. B&J Inc, is the Member case (Civil Action 2:20-881).  This opinion will decide both cases.

## PARTIES

Kiewit Louisiana Company ("Kiewit") contracted with DP Concrete Products (DP) to manufacture 1000 pilings and to deliver them by barge from DP's facility in Vinton, Louisiana to Kiewit's Liberty MOF facility in Cameron. DP chartered two deck barges (M-868) and (DH-9532) from McDonough Marine Service d/b/a Marmac (sometimes referred to as Marmac or McDonough) to carry the pilings from Vinton to Cameron. DP also chartered the ZOIE, a pushboat (also referred to as a "tugboat"), to push the barges from Vinton to Cameron. The ZOIE was involved in the subject incident in this lawsuit.

## **THE INCIDENT**

The two barges (the M-868 and the DH-9532) were loaded in Vinton and taken to the Liberty MOF in Cameron where they were unloaded.  The barges then returned empty to Vinton and were reloaded and taken to the Liberty MOF to be unloaded.  The ZOIE made three of these back-and-forth trips prior to the incident that is the subject of this lawsuit. The ZOIE pushed both barges side by side on each trip. The width of both barges was 70 feet and the total length of the barges with the ZOIE was about 240-250 feet in length.[1]

On December 27, 2019, through December 28, 2019, the last occasion for the ZOIE to move the two barges, the ZOIE arrived at the Liberty MOF where the ZOIE crew moored and secured the barges to the Liberty MOF dock.  The ZOIE and her crew then departed.  Because of the New Year holiday, the barges were not immediately unloaded.

From December 28, 2019, until about January 2, 2020, the two barges remained secured and level at the Liberty MOF facility. During the five days that the barges were moored, the barges slowly took on water. On the early morning of January 2, 2020, the barges capsized causing a loss of their cargo and also causing damage to an adjacent Dolphin tripod owned by Halliburton, Kiewit's crane barge and crane, and the M-868 and DH-9532.

---

[1] Tr. Day 1, p. 91.

## CLAIMS

B&J brought this action for exoneration and/or limitation of liability. B&J values the ZOIE, and her freights to be $183,800.00. This value was not disputed at trial. Kiewit brought the member action (Civil Action 2:20-881) based on a breach of contract against DP for failure to deliver the pilings on a seaworthy barge and damage to its crane barge, the SEATTLE, and the crane atop the SEATTLE. The parties have stipulated to the evidence of Kiewit's damages, which totals $1,202,467.97.[2]

DP is seeking damages for a total amount of $635,693.06,[3] and Marmac is seeking $43,389.00 in damages for the repair costs of the M-868 and DH-9532.[4]

## WITNESSES

The following witnesses testified live at trial:

- Kirk Romero
- Kenneth Verdine
- Adam Barras
- Anthony Verret
- Brenda Boudreaux
- Marc Fazioli
- James Stansbury, III
- Ryan Price
- Jason Tieman
- Tim Anselmi
- Robert Bartlett
- John Leary

---

[2] Docs. 149-97 through 149-128; Kiewit's Demonstrative No. 5, exhibit 315e.

[3] Survey leasing new barges   $5,240.00
  Post incident moving of barges   $61,075.37
  Pile and delivery   $452,693,63
  Marine Chemist   $850.00
  Lighted buoys   $18.961.06
  Barges/towing for salvage   $30,430.00
  Disposing of pile   $66,443.00

[4] Doc. 119, pp. 3 and 4.

**EXHIBITS**

The parties stipulated to 397 exhibits, which can be found in the record as Document 149.

**ISSUES**

Here, the Court must determine whether or not B&J is exonerated. If exonerated, B&J is not liable.  If the Court finds that B&J is not exonerated, we must determine if B&J's liability is limited or not limited.  As to Kiewit's claim, the Court must determine if there was a breach of contract by DP for failing to deliver the pilings on a seaworthy barge.

**The Trial Testimony**

*Kirk Romero*

Kirk Romero, is a deckhand for B&J and was working on the ZOIE voyage on December 27, 2019 and December 28, 2019.[5] Romero testified as follows.

 At the time of the incident, Romero had been working for B&J for about six months but had been previously employed by several other tow boat companies as a deckhand.[6] Romero testified that a Job Safety Analysis ("JSA") was completed on each trip he made with B&J, as well as the trip involving this incident.[7]

Romero received no training, had not been tested, nor watched any training videos at B&J. Romero was not trained by B&J on how to check drafts of a barge.  Romero was

---

[5] Tr. Day 1, p. 55.
[6] Tr. Day 1, p. 41.
[7] Tr. Day 1, p. 42

trained and evaluated by the captains.[8] Romero had made the previous trips from Vinton to Cameron. The barge did not drag the bottom on first trip, but during the second and third trips, the barges drug the bottom of the Vinton Canal.[9] The tide would cause the barges to drag bottom on some occasions, which was a common occurrence.[10]

Verret and Verdine were the Captains on the voyage made on December 27-28, 2019.[11] Prior to the voyage and after the barges were loaded with their cargo, Romero checked the lines, sniffed the hatches for air coming through, check the freeboard, and confirmed that everything was good up front. Romero then reported to the captain, who documented the drafts on the voyage plan and logbook.[12] Because the pilings were covering the hatches, Romero could not open the hatches for a visual inspection but relied on the absence of the sound of air coming through the hatches to determined that the voids were not leaking water.[13]

As the ZOIE was pushing the barges down the Vinton canal, the barges drug the bottom of the canal until it reached the Intercoastal Waterway.  Because a fog set in, Captain Verdine elected to stop the ZOIE in the canal for about five hours and wait for the fog to lift.[14]  Romero testified that even though the ZOIE and its barges were stopped in the Vinton Canal, the barges were never grounded, nor did they ever list.[15] Romero explained that the difference in stopping a barge and grounding a barge is that when

---

[8] Tr. Day 1 pp. 45, 93.
[9] Tr. Day 1 pp. 49-50.
[10] Tr. Day 1, p. 53-55.
[11] Tr. Day 1, p. 56.
[12] Tr. Day 1, p. 56-57.
[13] Tr. Day 1, p. 56-57, 67.
[14] Tr. Day 1, p. 57.
[15] Tr. Day 1 pp. 59, 96, 98.

grounding, you cannot move, whereas when stopping the barge, you can move the barge forward.[16] He also testified that he never felt the barges hit anything during the entire voyage.[17]

After the fog lifted, Romero walked the barge and noted no changes in their condition as far as freeboard and draft.[18] Captain Verret continued through the Vinton Canal until the ZOIE reached the Intercoastal Waterway.  Romero walked the barge and noted no changes in their condition as far as freeboard and draft.[19] Here, the ZOIE had to make a left turn eastward.[20] At this turn, the bank is made up of rip rap and/or referred to as the rock jetties.[21]  The rip rap is an embankment made up of rock. Romero testified that the barges never struck the rip rap, nor did the barge ever stop in the turn.[22]

When the ZOIE reached the Liberty MOF, Romero performed the four-corner draft test and determined that there was no issue regarding leaking water into the barges.[23] Romero reported the drafts to the Captain.[24] Romero testified that the barges were level when they left the Vinton facility and they were level when they reached the Liberty MOF.[25] Upon arrival, Romero had no communication with any Kiewit personnel.[26]

---

[16] Tr. Day 1, p. 80.
[17] Tr. Day 1, p. 61.
[18] Tr. Day 1, p. 98.
[19] Tr. Day 1, p. 98.
[20] Tr. Day 1, p. 62.
[21] Tr. Day 1, p. 67.
[22] Tr. Day 1, p. 99.
[23] Tr. Day 1, p.  68.
[24] Tr. Day 1, p. 68.
[25] Tr. Day 1, p. 76.
[26] Tr. Day 1, p. 72.

After the incident, Romero and the Captains went to the Kiewit facility and inspected the M-868.  Romero went in the confined spaces of the barge and observed rust and numerous lap patches.[27] Romero did not step on the bottom of the barge because it was flexing, and/or bending.[28] Romero explained that the bottom of the barge would support his weights (180 lbs.).

*Captain Verdine*

Captain Verdine was one of the two licensed captains piloting the ZOIE on the date of the incident.[29] He holds a Master's unlimited license and has been a captain for 30 years.[30] Verdine testified that he and/or his crew were unable to open the hatches on the barges due to potential poisonous gases,[31] therefore he relies on visual inspections by the deckhand to determine the drafts and if the barges were level.[32] The deckhand will communicate with the Captain, who writes the drafts and/or freeboards on the Captains' voyage plan.[33] Noting that the draft was 1.2 feet on the night of the voyage, the Captain explained that he might have mistakenly document the 1.2 feet as draft, when it should have been freeboard.[34] Even though all four corners of the vessel are measured for draft, the Captain typically only documents one measure when they are equal.[35] Prior to leaving the Vinton dock, the barges were level and not listing.[36]

---

[27] Tr. Day 1 pp. 102-103.
[28] Tr. Day 1 pp. 103-104.
[29] Tr. Day 1 pp. 121-122.
[30] Tr. Day 1, p. 134.
[31] Tr. Day 1, p. 128.
[32] Tr. Day 1, p. 129.
[33] Tr. Day 1, pp. 131-132.
[34] Tr. Day 1, p. 134.
[35] Tr. Day 1, p. 135.
[36] Tr. Day 1, p. 135.

Captain Verrett's shift ended at 6:00 a.m., after which Captain Verdine took over pushing the ZOIE with its barges.[37] Captain Verdine testified that the barges drug bottom in the Vinton canal, but did not hit anything,[38] nor was the vessel grounded.[39] After the fog lifted, Captain Verdine proceeded down the Vinton Canal and made the left turn eastward into the Intercoastal Waterway.[40] He did not hit or strike the rip rap along the bank.[41] Captain Verdine testified he made a safe turn into the Intercoastal Waterway and did not hit anything.[42]

After the incident, Captain Verdine testified that he met with the Coast Guard who observed his movements during the voyage via the ZOIE's Coastal Explorer data.[43]  The Coast Guard did not take any action against him and did not allege that he had grounded the barges.[44]

When he arrived at the Liberty MOF, the deckhand reported the drafts to him.[45] Captain Verdine did not communicate with anyone at the Kiewit facility,[46] and prior to leaving, the barges were all level.[47]

*Adam Barras*

Barras is a marine surveyor hired by DP and Marmac to conduct a damage survey on the barges, including the crane barge, the SEATTLE.[48] Barras testified that while

---

[37] Tr. Day 1, p. 168.
[38] Tr. Day 1, p. 144.
[39] Tr. Day 1, p. 168.
[40]  Tr. Day 1, p. 149.
[41] Tr. Day 1, p. 190.
[42] Tr. Day 1, p. 152.
[43] Coastal Explorer gives you second by second track line of the ZOIE and its barges. Tr. Day 1, p. 156, 191-192.
[44] Tr. Day 1, p. 192.
[45] Tr. Day 1, p. 153.
[46] Tr. Day 1, p. 171
[47] Tr. Day 1, p. 172.

performing the survey, Captain Verret was present, and informed him that the vessel was grounded while waiting for the fog to lift.[49] Barras made notes of the survey and his conversations, and gave those note to James Stansbury.[50] However, Stansbury did not mention the alleged grounding in his notes.[51] During his survey of the M-868, Barras observed the 62 lap patches on the bottom of the barge.[52]

*Anthony Verrett*

Captain Verrett, a licensed master of tow boats and captain for over 25 years, was piloting the ZOIE and the barges on the night of the incident.[53] Verrett piloted the ZOIE for about an hour after leaving the Vinton facility and stopped the ZOIE when the fog set in.[54] Verrett testified that he did not ground the ZOIE and its barges, nor did he hit the bank.[55] When he left the Vinton facility, the barges were dragging the mud. Verrett understood that the 1.2 draft actually meant 1.2 freeboard on the voyage plan.[56] Verrett continued as the captain of the ZOIE until about 5:30 a.m. when Captain Verdine took over and continued the voyage after the fog lifted.[57]

About 45minutes prior to ZOIE's arrival at the Kiewit facility, Verrett contacted Stacey Berlin, with DP. Verret was informed that someone would be at the Kiewit facility to help secure the barges.  However, when the ZOIE and the barges arrived, there was no

---

[48] Tr. Day 1, pp. 200-201.
[49] Tr. Day 1, p. 203.
[50] Tr. Day 1, p. 204.
[51] Tr. Day 1, p. 208.
[52] Tr. Day 1, p. 209.
[53] Tr. Day 1, pp. 214, 247.
[54] Tr. Day 1, p. 215.
[55] Tr. Day 1 pp. 216, 220.
[56] Tr. Day 1, p. 217.
[57] Tr. Day 1, p. 220.

one at the facility dock.[58] Stacey informed Verret that once they secured the barges, they were released to leave.[59] Verret testified that he never told Barras or anyone else that the vessels were grounded during the voyage from the Vinton Canal to the Kiewit facility.[60]

When the ZOIE arrived at the Kiewit facility, Verrett assisted the two deckhands to secure the barges, and observed that there was no change in the draft or freeboard from when the barges left the Vinton facility.[61] Verret testified that when Verdine made the turn from the Vinton Canal to the Intercoastal Waterway, he did not hear the barges hit the rip rap, nor did he hear the barge stop, ground or back up.[62]

*Brenda Boudreaux*

Boudreaux and her husband are owners of B&J, Inc., the towing company, and Brenda is a part of the B&J management team.[63]  The owners of B&J are tasked with making policies and procedures concerning safety of the vessels.[64] B&J, with the help of consultants created a towing safety manual system ("TSMS").[65] However, B&J elected to use the Coast Guard rules in addition to referencing the TSMS.[66]

Mrs. Boudreaux testified that the Captains observe and check the water depth and draft and make sure that the barge appears in seaworthy condition.[67] She further explained that she followed the Coast Guard rules, including the Voyage Plan that was

---

[58] Tr. Day 1, p. 245.
[59] Tr. Day 1, p. 247.
[60] Tr. Day 1, p. 249.
[61] Tr. Day 1, p. 251.
[62] Tr. Day 1, p. 252.
[63] Tr. Day 3, p. 48.
[64] Tr. Day 3, p. 49.
[65] Tr. Day 3, p. 49.
[66] Tr. Day 3, p. 50.
[67] Tr. Day 3, p. 84.

presented to her by the Coast Guard.[68] She also testified that both the Captain and the deckhands would check the barges' forward and aft drafts, and the barges' watertight integrity, despite that there was no written policy.[69]

*Mark Fazioli*

Fazioli is an expert in marine safety and navigation, and marine survey.[70]  Fazioli arrived at the Liberty MOF to inspect the barges and perform a damage assessment.[71] Fazioli observed the leaking hole in the void area and where the bulkhead had been damaged causing free communication through the rake area and the adjacent starboard tank.[72]

During his testimony, the Court was presented a short video from the security video at the Kiewit facility, which showed the M-868 starting to list, lose its load of concrete piling, tilt toward the DH-9532 causing it to lose all but a few of its pilings. Then the M-868 springs up out of the water and comes down on the Dolphin tripod located on the adjacent Haliburton dock and the barriers of the Kiewit Liberty MOF dock.[73]

Fazioli went inside the M-868 and observed small holes on its bottom in the stern rake. The hole were stuffed with yellow nylon rope, placed there by the divers post-incident to stop the water leakage.[74] Water was coming through the several dime to quarter size holes in the stern rake, and then traveling to the bulkhead through a separated

---

[68] Tr. Day 3, p. 84.
[69] Tr. Day 3, p. 91.
[70] Tr. Day 2, p. 1.
[71] Tr. Day 2, p. 7.
[72] Tr. Day 2, Tr. pp. 7-8.
[73] Plaintiff's exhibit 41.
[74] Tr. Day 2, p. 34.

weld.[75] Consequently, the slow leak of water through the holes in the stern rake, and traversing through the separated weld into the bulkhead explains the fact that the barges were delivered, and yet did not capsize until 5 days later.[76]

Fazioli opined that the damage to the stern rake happened prior to the barge capsizing.[77] During his dry dock investigation, Fazioli observed scrapes on the bottom of the M-868 with indents that push up into the bulkhead. Fazioli remarked that these marks were in the same area as the holes.[78] Based on the markings of the scrapes, and their indentions, Fazioli concluded that it was more likely that the barges hit the rip rap as it was making its turn from the Vinton Canal into the Intercoastal Waterway.[79] In addition, Fazioli opined that the ZOIE made an intentional grounding.[80] The Court finds Fazioli less than credible considering that there was no testimony or evidence at the trial of this matter that the either Captain Verdine or Verrett intentionally grounded the ZOIE.  Also, the Court rejects Fazioli's opinion that the marks/scrapes on the bottom occurred during the voyage as explained below.

Fazioli also testified that DP assumed the barge owner's (McDonough/Marmac) responsibility for inspecting once per week or per voyage whichever is the most frequent. Fazioli based his testimony on  in the bareboat charter agreement between DP and McDonough/Marmac and the section regarding the vessel general permit ("VGP").[81] The

---

[75] Tr. Day 2, Tr. pp. 38-39, 42.
[76] Tr. Day 2, p. 40.
[77] Tr. Day 2, p. 41.
[78] Tr. Day 2, pp. 47-48.
[79] Tr. Day 2, p. 53.
[80] Tr. Day 2, p. 61.
[81] Tr. Day 2, pp. 183-185.

VGP also obligates the pushboat owner to visually inspect the towing vessel and any barges in tow.[82]

*James Stansbury, III*

The parties stipulated that Stansbury is an expert in vessel and marine survey. Stansbury explained that a charter survey is a survey that documents the current existing conditions of a barge or vessel.[83] The purpose of the charter survey is to compare a pre-charter survey to a later off-charter and determine what occurred during the charter period.[84]

McDonough is a client of Stansbury and Associates (sometimes referred to as "Stansbury") that utilizes Stansbury's services to provide a charter survey. Stansbury does not warrant the barges' seaworthiness, or that it is fit for a particular intended use.[85] Stansbury provided an "on hire survey" sometimes referred to as a "charter" survey on September 21, 2019.[86]

The September 21, 2019, charter survey indicated that the area on the M-868 where there were longitudinal scrape marks after the incident, did not have any holes, or indents.[87] The charter survey also indicated no holes in the stern rake compartment, and the compartment was dry.[88] The 33-year old barge did have rust scale, but there was no mention of the 62 lap patches and/or doubler plates that were on the M-868 in the

---

[82] *Id.*
[83] Tr. Day 2, p. 191.
[84] *Id.*
[85] Tr. Day 2, pp. 191-192.
[86] Tr. Day 2, pp. 193-195.
[87] Tr. Day 2, p. 196.
[88] Tr. Day 2, p. 197.

Stansbury charter survey.[89] Stansbury testified that when a lap patch is put over a hole, the area around that wastage continues to deteriorate.[90] Also, a barge with a number of lap patches is an indication of a pattern of deterioration.[91]

Stansbury and others surveyors jointly inspected the M-868 on January 4, 2020, after the incident and performed a damage survey while the barge was still in the water.[92] Stansbury noted the quarter-inch holes inside the stern rake compartment that were not noted on the September 21, 2019, charter survey.[93] He also inspected the M-868 after it was dry docked.[94] The dry docket survey revealed several holes that had been patched by divers.[95] Stansbury noted there were three (3) longitudinal creases (marks) up to two to three inches in depth that were visible on the stern rake bottom plate.[96] Stansbury indicated that these marks were of the same vintage, meaning they occurred at the same time.[97] Stansbury opined that whatever caused the holes also caused the three longitudinal marks.[98] Stansbury based his opinion solely on his visual observation that the longitudinal marks were in the same location as the holes.  The Court rejects this opinion.

Stansbury testified that there were other pin holes in the bulkheads not related to any striking or incident that occurred in January 2020. He attributed these pin holes to

---

[89] Tr. Day 2, pp. 198-199.
[90] Tr. Day 2, p. 236.
[91] *Id.*; Tr. Day 3, p. 23.
[92] Tr. Day 2, p. 205, 211; Plaintiff's exhibit 37.
[93] Tr. Day 2, p. 206.
[94] Tr. Day 2, p. 207.
[95] Plaintiff's exhibit 64.
[96] Tr. Day 2, pp. 209-210.
[97] Tr. Day 2, p. 212.
[98] Tr. Day 2, p. 213.

corrosion or wastage of the M-868.[99]  Stansbury testified that some of the holes in the January 2020, survey revealed that the M-868 was not watertight.[100] He also testified that in order for a barge to list, multiple bulkheads would have to fill with water and freely flow from one bulkhead through to another compartment.[101]

During Stansbury's testimony, it was revealed that the M-868 had been grounded on a prior voyage with IntrTug on August 10, 2019.[102] That particular grounding caused damage to the M-868 at the intersection of the forward bulkhead and the starboard side shell on the bow rake of the barge.[103] The damage indicated from the January, 2020 damage survey is in the same compartment where damage occurred in the grounding of August 2019.[104]

Stansbury also performed a damage survey on Kiewit's barge, the SEATTLE and noted the following damages: (1) damage to the crane counter weights, (2) damage to the port side just below deck, (3) port side damage that the plating heavily set in the beginning at the bow extending about 22 feet, (4) damage to the star side plating about nine feet, and (5) damages to the aluminum gangway that ran to the SEATTLE.[105] Stansbury attribute all of this damage to the January 2, 2020, incident involving the M-868.[106]

---

[99] Tr. Day 2, p. 238.
[100] Tr. Day 2, pp. 17-20; exhibit 47, p.10.
[101] Tr. Day 2, p. 238-239.
[102] Tr. Day 3, p. 6.
[103] Tr. Day 3, pp. 6-7.
[104] Tr. Day 3, pp. 17-18.
[105] Tr. Day 2, pp. 225-227.
[106] Tr. Day 2, p. 227.

Stansbury also performed a field damage survey on July 11, 2020, while the M-868 was dry docked.[107] Stansbury reported additional findings of damage to the spud and the starboard stern rake bottom.[108]

*Ryan Price*

Price is the Executive Vice President of Dunham Price.[109] Price testified that DP entered into a contract with Kiewit to manufacture and deliver 1,000 concrete pilings that were 19"X19" diameter and 90' long.[110] DP chartered B&J's pushboat, the ZOIE, to push the barges loaded with the concrete pilings from the DP Vinton facility to Kiewit's Liberty MOF facility in Cameron.[111] Price testified that once the pilings were loaded, it used the same kind of rule of thumb that B&J used  to determine if a barge was listing forward and aft; they would also inspect the barge prior to loading by opening the hatch covers.[112]

Regarding the December 27-28, 2019, voyage, B&J did not communicate with DP that there were any issues with the barges prior to or during the voyage.[113]

Price confirmed that DP and Kiewit had stipulated to Kiewit's damages.[114]

*Jason Tieman*

Tieman is an expert as an AIS data analytics expert.[115]   AIS is an automatic identification system required to be on all vessels for collision avoidance, including the

---

[107] Tr. Day 2, p. 228; exhibit 93.
[108] Tr. Day 2, p. 229.
[109] Tr. Day 3, p. 133.
[110] Tr. Day 3, p. 147.
[111] Tr. Day 3, p. 150.
[112] Tr. Day 3, p. 153.
[113] Tr. Day 3, p.170.
[114] Tr. Day 3, p. 180.

ZOIE.[116]  Tieman discussed how he tracked the ZOIE on the day(s) leading to the subject incident using the AIS data from the voyage in the Vinton Canal and the Intercoastal Waterway.[117]

The AIS data revealed when the ZOIE was stopped, when it was moving, and when it increased speed.[118]  The ZOIE stayed in the middle of the Vinton Canal, and stopped in the middle of the Vinton Canal from 1:00 a.m. until 5:30 or 6:00 a.m.[119] The ZOIE was traveling 2.1 knots as it entered the Intercoastal Waterway.[120] The ZOIE slowed down to 1.5 knots as it made the turn eastward into the Intercoastal Waterway.[121]

Tieman opined that the reduction of speed indicates that the Captain was twin screwing as he turned the head of his tow eastward.[122] The ZOIE made the turn traveling at 1.5 knots, in about 67 seconds and immediately picked up speed to 2.4 knots.[123] Tieman further opined that based on the ZOIE's speed, and the time it took to make the complete turn, it would not have had time to hit the rip rap, back up off the rip rap and reposition the ZOIE and its barges to head eastward.[124]

---

[115] Tr. Day 4, p. 28.
[116] Tr. Day 4, pp. 32, 34.
[117] Tr. Day 4, pp. 38-42.
[118] *Id.*
[119] Tr. Day 4, p. 46.
[120] Tr. Day 4, p. 47.
[121] Tr. Day 4, p. 50.
[122] Tr. Day 4, p. 50.
[123] Tr. Day 4, p. 51-52, 54.
[124] Tr. Day 4, p. 60.

*Tim Anselmi*

Anselmi was tendered as a marine surveyor, navigation expert, and qualified Coast Guard auditor.[125] Anselmi reviewed the NVI ultrasonic survey issued on February 5, 2020, post accident, and noted the holes in the stern as well as in the number one starboard void.[126] Anselmi also noted that the ZOIE was involved in a grounding on August 10, 2019, which involved that same compartment.[127]

Anselmi testified that he reviewed a valuation report by Mr. held who valued the ZOIE and it freights at $183,000 performed in 2022.[128] Anselmi conducted a desktop valuation and valued the ZOIE at $165,000.[129] However, Anselmi had no problem with Mr. Held's evaluation at $183,000, which included the ZOIE's freights.[130]

Anselmi criticized Stansbury's on-charter survey, which omitted the 62 lap patches that were present on the ZOIE when the survey was conducted.[131] Anselmi testified that not only would he have noted the 62 lap patches, but he would have alerted the barge owner of the risk involved with that many patches.[132] Anselmi opined that lap patches were not permanent repairs.[133]

---

[125] Tr. Day 4, pp. 85-86.
[126] Tr. Day 4, p. 102.
[127] Tr. Day 4, p. 103.
[128] Tr. Day 4, p. 104.
[129] Tr. Day 4, p. 105.
[130] *Id.*
[131] Tr. Day 4, p. 107.
[132] Tr. Day 4, p. 107.
[133] Tr. Day 4, p. 125.

Anselmi did not consider that pushing through the mud and/or stopping for fog to be a grounding.[134] Anselmi testified that the Captain's view from the wheelhouse on the ZOIE permitted him to determine if either of the barges were listing.[135]

Anselmi explained that a pin hole in a bulkhead will allow water to travel to an another compartment, which will ultimately result in the vessel capsizing.[136] Anselmi testified that Stansbury's previous trial testimony expressed that there were pinholes between the bulkheads of watertight compartments on this on-charter survey.[137] Anselmi also agreed with Tieman that based on the AIS data points, the speed of the ZOIE and its barges, and the time it took the ZOIE to make the turn, there was not enough time for the ZOIE to have hit the rip rap, stop, back up and reposition itself to a eastward heading.[138]

Anselmi opined that the marks on the stern rake could not have happened by hitting rip rap during a turn, noting that these marks were short, straight and longitudinal, and that if the barge had struck the rip rap, the marks would have been diagonal.[139] Anselmi attributed the three (3) longitudinal marks to be caused by the fender bumpers on the Liberty MOF dock when the M-868 listed, popped up out of the water, and landed on the edge of the dock.[140]

Anselmi testified that the tugboat captain has an obligation to make a visual external inspection of the barges to determine if they can transit safely with the load.[141]

---

[134] Tr. Day 4, p. 111.
[135] Tr. Day 4, p. 114.
[136] Tr. Day 4, pp. 125-127.
[137] Tr. Day 4, p. 127.
[138] Tr. Day 4, p. 135.
[139] Tr. Day 4, p. 136.
[140] Tr. Day 4, pp. 136-142.
[141] Tr. Day 4, p. 175.

The Court accepts Anselmi's opinion that the longitudinal marks were caused by the M-868 springing out of the water and hitting the edge of the Liberty MOF dock as it descended.

*Robert Bartlett*

Bartlett is a expert as an metallurgist and mechanical engineer.[142] Bartlett opined that the pin hole discovered in the M-868 from the NVI UTI survey in February 2020, was caused by corrosion and could account for the ingress of water.[143] Bartlett explained the "Darcy" permeability principle and formula that can account for how a rusted corroded area can maintain its watertight capacity until at some point it does not.[144] Thus, as some point, the corroded area has a breaking point.

Bartlett also testified about the straight longitudinal marks on the outside of the M-868.  Bartlett testified that if the M-868 had pulled from a grounding, "you would have a scratch that documents the path of the foreign object that made contact with the bottom of the barge."[145] Bartlett opined that the subject scratch marks were not caused by a grounding.[146] The Court accepts Bartlett's opinion.

Finally, Bartlett opined that based on the 62 lap patches, the pinholes, and the hole in the starboard No. 1 tank, the corrosion activity on the M-868 was extensive.[147]

---

[142] Tr. Day 4, p. 225.
[143] Tr. Day 4, p. 227.
[144] *Id.*
[145] Tr. Day 4, p. 228.
[146] *Id.*
[147] Tr. Day 4, pp. 239-240.

*John Leary*

Leary testifies as an expert naval architect marine engineer and civil engineer.[148] Leary opined based on the expert report, testimony and evidence presented at trial, that the bulkheads were not watertight.[149] He further opined based on his experience, that if only one compartment filled with water due to a hole, as long as the other compartments were watertight, the barge would not have capsized.[150]

*Deposition testimony of Jody Singletary*

Singletary's deposition testimony was admitted as the corporate representative of DP.[151] Singletary testified that he had receive documents concerning EPA regulations/instructions and the Vessel General Permit rules regarding the DH-9532 and M-868 via a letter from McDonough Marine (Marmac).[152] Singletary testified that he was not aware of DP doing anything with regard to its obligations and the DH-9532 and the M-868.[153] Singletary also confirmed that DP was responsible for  complying with the EPA regulation.[154]

*Deposition testimony of Eric Hebert*

Hebert's deposition testimony was admitted as the corporate representative of DP.[155]  Attached to his deposition is a statement made by Hebert on 1/2/19 at 12:15 p.m. shortly after he had been informed of the incident.  In his statement, Hebert recalls a

---

[148] Tr. Day 4, p. 241.
[149] Tr. Day 4, p. 244.
[150] Tr. Day 4, p. 245.
[151] Doc. 150-2, with attached exhibits 38 and 39.
[152] *Id.* pp. 82-83.
[153] *Id.* p. 83.
[154] Exhibit 7, attached to B&J's exhibit B, Doc. 150-2.
[155] Doc. 150-1.

conversation he had Stacy Berlin of DP, who informed him that she had been in contact with Jermaine Porter , a Kiewit employee throughout the transit of both barges and that she had communicated with Captain Anthony (Verrett), Ace Duyao, Adam Pretcher, and Jermaine informing them of the arrival of the barges estimated to be around 5:00 p.m.[156] Jermaine replied that all crews were gone and asked if anyone needed to be there, to which Stacy responded, no, the tugs know what to do.[157] Jermaine said he would check the barges Sunday morning (12/20/2019).[158]

*Stipulations*

The parties stipulated that DP's damages are $635,693.06 and McDonough Marine d/b/a Marmac's damages are $43,389.00.[159] The parties stipulated to the evidence of Kiewit's damages, which total $1,202,467.97.[160]

## FINDINGS OF FACT AND LAW

*Exoneration/limitation*

In *Stevens v. The White City*, 285 U.S. 195 (1932), the United States Supreme Court held that suit by the owner of a barge or tow against the tug/pushboat and its owner was a cause of action *ex delicto* and not *ex contractu. The White City*, 285 U.S. at 201. In characterizing the suit as sounding in tort, the Supreme Court reasoned that a tug/pushboat does not serve to insure the tow or act as bailee of the tow. *The White City*, 285 U.S. at 202.

---

[156] Doc. 150-1, p. 7.
[157] *Id.*
[158] *Id.*
[159] Tr. Day 4, p. 27.
[160] Exhibits 96-127, Docs. 149-97 through 149-128; see also Demonstrative No. 5, exhibit 315e.

Although a tug is neither a bailee nor an insurer of the tow, it is obligated to provide reasonable care and skill "as prudent navigators employ for the performance of similar service." *Id.*; *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 1077, 1081, (5th Cir. 1983); *Agrio Chemical Co. v. M/V Ben W. Martin*, 664 F.2d 85, 90 (5th Cir.1981).

A towage implies that (1) the towing vessel will be adequately powered, equipped and efficient, (2) reasonable skill, energy, care and diligence will be exercised in the performance of the work, and (3) the tug's crew, tackle and equipment will be equal to the work to be accomplished in weather and circumstances reasonably to be expected. *The Margaret*, 94 U.S. 494 (1876); *Cargill, Inc. v. C&P Towing Co. Inc.*, 1991 AMC 101 (E.D. Va. 1990); *United States v. LeBouef Bros. Towing Co.*, 1978 AMC 2195 (E.D.LA. 1978); *Selim v. Naviera Aznar*, 1976 AMC 673 (N.D. Ohio 1976).

When the owner of a tug/pushboat undertakes to transport a barge/tow and to take entire charge of its navigation, the owner of the barge is liable for its seaworthiness and the owner of the tug for its safe navigation. *Hart v. Blakemore*, 410 F. 2d 218, 221 (5th Cir. 1969) citing *Curtis Bay Towing Co., Inc. v. Southern Lighterage Corp.*, 200 F.2d 33 (4th Cir. 1952) and *The Radnor*, 21 F.2d 982 (D.C.Md. 1927). The tug has an obligation to exercise the reasonable care and maritime skill that prudent navigators employ in performing similar services, and the burden of proving negligence is on the party that asserts it against the tug/pushboat. *White City*, *supra*; *River Terminals Corp. v. Southwestern Sugar and Molasses Co.*, 274 F.2d 36 (5th Cir. 1960); *Stall & McDermott v. The Southern Cross*, 196 F.2d 309 (5th Cir. 1952).

The barge owner, McDonough Marine d/b/a Marmac and DP, as the demise charterer is responsible for the seaworthiness of its vessel. *S.C. Loveland, Inc. v. East West Towing, Inc.*, 415 F.Supp. 596, 605 (S.D. Fla. 1976) *aff'd.* 608 F.2d 160 (5th Cir. 1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852 (1980). See also *Winn v. C.I.R.*, 595 F.2d 1060 (5th Cir. 1979) (A barge owner has a non-delegable duty to furnish a seaworthy vessel in contract of towage). To be seaworthy, the barge need only be reasonably fit for its intended purpose. *Parker v. S/S Dorothe Oloendorff*, 483 F.2d 375 (5th Cir. 1971), *cert denied* 416 U.S. 905,94 S.Ct. 1609 (1974). Here, the intended purpose was to transport concrete pilings from the Vinton Canal, well know for its shallow depth and silky mud bottom, through the Intercoastal Waterways to the Liberty MOF facility in Cameron. It was common practice for the barges to be moored for several days at the dock before its cargo was unloaded.

Those persons responsible for the handling of the barge such as B&J, the tower, is obligated to perform these tasks using such care as a prudent person would under similar situations. *Derby Company v. A.L. Mechling Barge Lines, Inc.*, 258 F.Supp. 206, 211 (E.D.La. 1966) *aff'd,* 399 F.2d 304 (5th Cir. 1968).

The Court finds that Captains Verrett and Verdine, and deckhand Romero were credible witnesses. Each of these witness testified that prior to leaving the Vinton facility, the barges were visually inspected by observing that forward and aft drafts and freeboard. They further testified that they observed no listing or reason to believe that the barges, specifically the M-868, was taking on water. Romero also testified that although he did not open the hatches, he sniffed the air coming out of the holes of the hatch to determine

if there was any water leakage.  He determined there was not. Again, the Court finds that these witnesses were not impeached at trial and their testimony was consistent and credible.

During the voyage Captain Verrett stopped the tow due to fog. After the fog lifted, Captain Verdine pushed the ZOIE and its barges into the Intercoastal Waterway. Captains Verdine and Verrett, and deckhand Romero testified that the ZOIE did not ground as suggested by DP. In addition, the testimony and evidence presented by experts Tieman and Anselmi confirms that the ZOIE was not grounded either during its traversal through the Vinton Canal or when it made a port turn eastward from the Vinton Canal into the Intercoastal Waterway.

DP and McDonough rely on the maritime law's doctrine of *res ipsa loquitur*, which would presume that B&J was negligent, and then shift the burden of proof to B&J to prove a lack of privity of knowledge.

Under maritime law, the doctrine of *res ipsa loquitur* applies only when three circumstances are present: "1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of a type that ordinarily does not occur in the absence of negligence." *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1115 (5th Cir. 1985) (citing *Johnson v. United States*, 333 U.S. 46 (1948)); *see also Chiasson v. Brand Energy Sols., LLC*, 452 F. Supp. 3d 472, 477 n. 3 (W.D. La. 2020) (Summerhays, J.) (declining to apply the *rep ipsa loquitur* doctrine where all three circumstances set forth in *Nassau* were not present). The factfinder is permitted to infer negligence based on *res ipsa loquitur* only when "'other

plausible explanations have been reasonably ruled out.'" *Hathorn v. Marquette Transportation Co. Gulf-Inland, LLC*, No. CV 15-5782, 2018 WL 1202551, at *3 (E.D. La. Mar. 8, 2018) (quoting *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 937 (5th Cir. 2014), *overruled on other grounds by Sanchez v. Smart Fabricators of Texas, L.L.C.*, 997 F.3d 564 (5th Cir. 2021)).

DP and McDonough argue that B&J has failed to provide any legitimate explanation of the impact damage sustained to the M-868's stern rake while under tow. The Court disagrees.  The Court finds based on the testimony and evidence submitted at trial that there was no negligence by B&J and/or its crew members and the doctrine of *res ipsa loquitur* is rejected.

DP and McDonough maintain that the ZOIE's crew failed to comply with 33 CFR § 164.80(3) by not formally recording forward and after drafts of the barges. The first paragraph of 33 CFR § 164.80(3) provides as follows:

> (3) If any part of a towing vessel's intended voyage is seaward of the baseline (i.e., the shoreward boundary) of the territorial sea of the U.S., then the owner, master, or operator of the vessel, employed to tow a barge or barges, must ensure that the voyage with the barge or barges is planned, taking into account all pertinent information before the vessel embarks on the voyage. The master must check the planned route for proximity to hazards before the voyage begins. During a voyage, if a decision is made to deviate substantially from the planned route, then the master or mate must plan the new route before deviating from the planned route. The voyage plan must follow company policy and consider the following (related requirements noted in parentheses):

(emphasis added). According to the plain language of this regulation, 33 CFR § 164.80(3)'s voyage plan requirements apply solely in circumstances where the towing

vessel's voyage takes her seaward of the territorial sea baseline. See also *Craig H. Allen, Hiding Behind "Tradition"? Should U.S. Vessel Traffic Centers Exercise Greater Direction and Control over Vessels in Their Areas?*, 34 Tul. Mar. L.J. 91, 152 (2009) ("With respect to towing vessels, the Coast Guard only requires voyage plans of those vessels the intended voyage of which extends to waters lying seaward of the territorial sea baseline.") (emphasis added).

The territorial sea baseline means "the line defining the shoreward extent of the territorial sea of the United States drawn according to the principles, as recognized by the United States, of the Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606, and the 1982 United Nations Convention on the Law of the Sea (UNCLOS), 21 I.L.M. 1261." 33 C.F.R. § 2.20. Furthermore, "all waters seaward of the territorial sea baseline" mean the high seas, which are all waters not included in a nation's exclusive economic zone, the territorial sea (i.e., the waters adjacent to the coast of a nation up which extends up to 12 nautical miles), or the internal waters of a nation. 33 C.F.R. § 2.22(a)(1); *United States v. Santos-Santana*, No. 22-10367, 2022 WL 17973602, at *7 (11th Cir. Dec. 28, 2022).

The ZOIE operated inland and did not involve the high seas at any point. Thus, 33 CFR § 164.80(3) does not apply here.

Regarding inspections, DP was required to comply with the rules set forth in the Vessel General Permit, per contract, and  was required to comply as follows:

4.1 Self Inspections and Monitoring

You must conduct the following inspections of your vessel.

### 4.1.1 Routine Visual Inspections

Except as provided below, a routine visual inspection must be conducted at least once per week or per voyage, whichever is more frequent…or unless multiple voyages occur in a single day. If vessel owners/operators engage in multiple voyages per day, they need not conduct inspections on every voyage, but must conduct inspections at least once per day.

### 4.1.1.1 Documentation of the Routine Visual Inspection

You must document the findings of each routine visual inspection in the official ship logbook or as a component of other recordkeeping documentation referenced in Part 4.2. You must document the date and time of inspection, ship locations inspected, personnel conducting the inspection, location of any visual sampling and observations, note any potential problems and sources of contamination found, and it must be signed by the person conducting the inspection, if not the Master. For limited visual inspections, you need only initial that the inspections were conducted as an addendum to the documentation of the full "weekly" visual inspection, unless additional potential problems or contamination is found.[161]

The evidence submitted establishes that the M-868 was not seaworthy due to the scaling, excessive corrosion, and holes in the bottom of the barge.  The Court further finds that the longitudinal marks on the rake were caused when the M-868 barge capsized, lost is cargo, and violently sprang out of the water, descending on the edge of the Liberty MOF dock. The Court finds that the ZOIE and her crew members navigated the M-868 and DH-9532 with the reasonable skill, care, and diligence in their performance that prudent mariners would employ in performing similar services. Consequently, the Court will exonerate B&J from all liability.

---

[161] B&J's exhibit B.

*Kiewit's breach of contract claim*

Kiewit asserts a breach of contract claim against DP for failure to deliver the pilings. The Contract has two components: a contract of sale and a contract of carriage. The Contract was for the sale by DP Concrete to Kiewit of one thousand (1,000) 18" x 18" x 90' concrete pilings at the price of $2,335,500.[162] The Contract further required that DP Concrete deliver the pilings by barge to Kiewit at its marine offloading facility (the "Liberty MOF") on the navigable waterways in Cameron Parish at the shipping cost of $407,700.[163]

The barge delivery portion of the Contract is a maritime contract and the incident at issue occurred on navigable waters. For mixed service contracts, the Fifth Circuit's test requires that the contract: (1) must be for services to facilitate activity on navigable waters and (2) must provide, or the parties must expect, that a vessel will play a substantial role in the completion of the contract. *Barrios v. Centaur, L.L.C.*, 942 F.3d 670 (5th Cir. 2019) (finding that the parties contemplated that the substantial use of a vessel, namely a barge that would be shifted using a tugboat and winch, would be required to complete the contact).

To establish breach of a maritime contract, a plaintiff must demonstrate (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *In re Chester J. Marine LLC,* 636

---

[162] Doc. 149-3; see also DP corporate deposition, (Jody Singletary) pp. 14:1-25, 15:1-19.
[163] *Id.* p. 15,11, 20-23.

B.R. 704 (Bankr. E.D. La. 2021) (quoting *W. Towboat Co. v. Vigor Marine, LLC,* No. 20-0416, 2021 WL 2531009, at *8 (W.D. Wash. June 21, 2021)).

DP argues that because the terms in the contract state "Incoterm Key Location: DDP Delivery Duty Paid," ("DPP")[164] DP's obligation under the contract ended when the barges were delivered to the Liberty MOF.

Incoterms are a series of pre-defined commercial terms published by the International Chamber of Commerce (ICC).[165] They specify who (buyer or seller) incurs transport costs, export, and import charges or risks associated with the sale of goods. Of all the Incoterm rules, DDP places the maximum obligations on the seller, which in this case is DP Concrete. Under DDP, the seller assumes all risk, responsibilities, and costs for delivering the goods to the named place of destination. DDP is defined as:

> The seller delivers the goods when the goods are placed at the disposal of the buyer, cleared for import on the arriving means of transport ready for unloading at the named place of destination. The seller bears all the costs and risks involved in bringing the goods to the place of destination and has an obligation to clear the goods not only for export but also for import, to pay any duty for both export and import and to carry out all customs formalities.

*Tian Long Fashion Co., Ltd. v. Fashion Avenue Sweater Knits*, LLC, 2016 WL 4097801 (S.D.N.Y. Jul. 25, 2016) (quoting THE INCOTERMS RULES, http://www.iccwbo.org/products-and-services/trade-facilitation/incoterms-2010/the-incotermsrules, at 69) (emphasis added).[166]

DP failed to make delivery of the goods ready for unloading at the Liberty MOF. A sinking and unseaworthy barge loaded with thousands of tons of concrete piles is not

---

[164] Joint Exhibit 3.
[165] *See* http://halleycables.com/img/cms/INCOTERMS%202010%20Guide.pdf (the "Incoterms 2010 Guide").
[166] *See also* Incoterms 2010 Guide, at pp. 149-158.

"ready for unloading." As noted by Kiewit, delivery was to be made upon seaworthy barges that would remain afloat during piling unloading.

In order to establish a prima facie case of a bailment and raise a presumption of defendant's negligence, a plaintiff must prove (1) an agreement, express or implied, (2) delivery of the property in good condition, and (3) its nonreturn or redelivery in a damaged condition. *Nat'l Liab. & Fire Ins. Co. v. R&R Marine, Inc*., 756 F.3d 825, 830 (5th Cir. 2014).

DP chartered two barges, the M-868 and the DH-9532, from McDonough[167] and pushboat services from B&J to fulfill DP's Contract obligation to deliver the pilings by barge. The Contract between DP and Kiewit contains no terms for bailment, including no terms to take care, store, fleet, or safekeep the barges.[168]

The contract required DP to deliver the pilings to the Liberty MOF on the barges and then take the barges away from the Liberty MOF once the piles were unloaded.[169] There is no express or implied contract for bailment.

Next, under bailment, the onus is on the bailor (vessel owner) to show that the vessel was delivered to the bailee in good condition. *Nat'l Liab. & Fire Ins. Co. v. R&R Marine, Inc,*. 756 F.3d 825 (5th Cir. 2014). And finally, there was no redelivery option.

DP Concrete completed four (4) deliveries of pilings pursuant to the Contract utilizing the barges as the transportation vehicles.[170] The established custom and practice through the four deliveries was for the barges to remain moored afloat at the Liberty

---

[167] Doc. 149-4 (M-868 Charter); Doc. 149-5 (DH9532 Charter).
[168] Doc. 149-3.
[169] DP corporate deposition, Hebert, p. 24:11-14.
[170] Kiewet's Demonstrative No. 1, Exhibit 315a.

MOF for varying periods of time (between 4 and 19 days) until Kiewit unloaded the pilings and then called DP to remove the barges.[171]

Due to the Court's finding that the M-868 was unseaworthy, which the Court finds caused both barges to lose their cargo, the Court finds that DP breached the contract for failing to deliver the pilings on seaworthy barges. Therefore, DP is liable for the damages caused by the M-868 to the crane barge, the SEATTLE and the crane that sat atop the SEATTLE. The parties have stipulated as to these damages, which total $1,202,467.97.[172]

## CONCLUSION

For the reasons set forth above, the Court finds that B&J, Inc. is exonerated from liability for the incident that occurred on January 2, 2023.  The Court further finds that DP Concrete, LLC breached the contract with Kiewit Louisiana Company by failing to properly deliver the pilings. The Court will enter a judgment in favor of B&J, Inc. as to its exoneration of liability, and in favor of Kiewit Louisiana Company and against DP Concrete, LLC for the stipulated damage amount of $1,202,467.97.

**THUS DONE AND SIGNED** in Chambers on this 5th day of May, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[171] *Id.*
[172] *Id.*